NO. 4-06-0690          Filed 4/18/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: TOMMY B., a Person Found | ) | Appeal from |
| Subject to Involuntary Admission, | ) | Circuit Court of |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Sangamon County |
|        Petitioner-Appellee, | ) | No. 06MH474 |
|        v. | ) | |
| TOMMY B., | ) | Honorable |
|        Respondent-Appellant. | ) | George H. Ray, |
| | ) | Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

In July 2006, the trial court found respondent, Tommy B., subject to involuntary admission to a mental-health facility (405 ILCS 5/1-119(1), (2) (West 2004)). Respondent appeals, arguing reversal is warranted because (1) the petition was defective, (2) no clear and convincing evidence supported respondent's involuntary commitment, and (3) hospitalization was not the least-restrictive treatment alternative. We affirm.

I. BACKGROUND

On July 17, 2006, a licensed practical nurse at Memorial Medical Center (Memorial), Jolynne A. Ralston, filed a petition for the involuntary admission of respondent, a voluntary admittee who had filed a written notice requesting discharge. The petition alleged respondent was mentally ill and by reason of his mental illness (1) was reasonably expected to inflict serious

physical harm upon himself or another in the near future, or (2) was unable to provide for his basic physical needs so as to guard himself from serious harm. In support of those allegations, Ralston provided the following factual basis:

> "[Respondent] has a chronic mental illness and is noncompliant with medication and mental[-]health services. He has threatened staff. He threatened to 'beat the shit['] out of a staff member. He also attempted to hit staff[']s hand with phone receiver."

Ralston left the following portion of the petition blank:

> "Listed below are the names and addresses of the spouse, parent, guardian, or surrogate decision maker, if any, and close relative or, if none, a friend of the respondent whom I have reason to believe may know or have any of the other names and addresses. If names and addresses are not listed below, the following describes my efforts to identify and locate these individuals."

The petition was accompanied by the certificates of two psychiatrists.

The trial court set a hearing on the petition for July 21, 2006. On respondent's motion, and over the State's objec-

- 2 -

tion, the hearing was continued until July 28, 2006.

At the hearing on June 28, 2006, psychiatrist James Black testified he was board certified and currently respondent's treating physician. Dr. Black examined respondent on July 27, 2006. During the examination, respondent exhibited signs of mental illness, including delusions, pressured speech, grandiosity, increased energy, and difficulty with sleep. Respondent did not threaten anyone during that conversation. However, Dr. Black testified that during the hospital stay respondent had been threatening and insulting to others.

Dr. Black diagnosed respondent with bipolar disorder with mania and psychosis. Dr. Black believed, within a reasonable degree of medical certainty, that because of his mental illness, respondent was unable to provide for his basic physical needs so as to guard himself from serious harm. Dr. Black testified that respondent had a number of potentially life-threatening medical disorders, including recurrent renal cell carcinoma, right periaortic mass of cancer, severe papillary thyroid disease, and chronic renal failure (hereinafter referred to as "nonpsychiatric medical disorders"). Respondent could not understand his medical risks, the treatments offered, and risks if he does not get treatment for his nonpsychiatric medical disorders.

Dr. Black also believed, within a reasonable degree of

- 3 -

medical certainty, that respondent was reasonably expected to inflict serious physical harm upon himself or another within the immediate future. Dr. Black testified that if respondent left his supervised setting, he would "fairly quickly decompensate and be dangerous to himself or others quickly." He based this conclusion on the fact that respondent had done so on an almost daily basis at the hospital (presumably during his voluntary admission). On a number of occasions, almost every day, respondent had threatened others, causing respondent to require restraints and medications to stabilize him.

In light of his opinions, Dr. Black believed respondent needed treatment. A treatment plan had been formulated and was admitted into evidence without objection for the limited purpose of the dispositional hearing. According to Dr. Black, the treatment plan was the least-restrictive alternative. Based on the treatment plan, Dr. Black recommended respondent be treated at Memorial for a period not to exceed 90 days.

Dr. Black did not testify in detail regarding the treatment plan. However, an examination of the treatment plan reveals that respondent's plan of care had been revised to require restriction to his room with supervision to be evaluated daily. The July 24, 2006, progress report indicates that due to respondent's threatening behavior, inability to comply with limit setting, and actual staff assaults, respondent was restricted to

- 4 -

his room or under staff supervision outside of his room.  No one was permitted to enter respondent's room alone.  Any threats of harm to others would result in seclusion or restraints.

On cross-examination, Dr. Black admitted that in some cases psychosis could be caused by thyroid disease.  However, Dr. Black did not believe thyroid disease caused respondent's psychosis.

The delusions respondent suffered from included respondent's belief that he had been a pharaoh and that bullets could pass through him.  When asked what delusion would place respondent or another in serious physical harm, Dr. Black responded that respondent refused treatment for his cancer.  Dr. Black later explained, however, that respondent had not been offered treatment for his cancer at this point but had only been offered diagnostic studies.

According to Dr. Black, respondent had interfered with treatment for his thyroid disease by pulling out his IV (intravenous) and heart-rhythm monitor.  Other examples of delusional beliefs that placed respondent or another in serious harm included respondent's belief that he was going to live forever and delusions that caused respondent to attack other patients and threaten to kill staff.

Dr. Black testified respondent currently received treatment from physicians and other personnel in oncology, renal,

endocrinology, and nutrition. Respondent could not be discharged to a medical floor to obtain that treatment because he was too mentally ill. If respondent were on a medical floor, his behavior would be too much for them to manage, and respondent would be unsafe.

Respondent took his psychiatric medication some of the time. Respondent's last incident of assaultive behavior occurred the previous weekend. After that, Dr. Black started a new behavioral program and confined respondent to his room. Respondent had been doing better under the new program.

Respondent, who was represented by counsel, testified on his own behalf. When asked if he would like to say anything regarding the allegations of aggression, respondent explained two incidents. On one occasion, an orderly or nurse named David kept pushing respondent. Respondent told David he was going to his room and not to push him anymore. When David pushed him again, they "tussled" and went down on the floor. Another staff member, Joe, came and grabbed respondent's arm. Respondent told Joe that if Joe broke respondent's arm, respondent would take his eyes out. Joe let go of respondent's arm. Respondent testified the other incident happened the same way. Respondent stated he was not going to be pushed around when he was going in the direction he was supposed to be going.

Respondent testified he was originally a voluntary

patient. He first went to St. John's Hospital because of kidney failure. After his release, he and his wife had a "series of incidents." They were supposed to get a divorce that Friday. Respondent ended up back at the hospital. At Memorial, he was treated for kidney failure. Respondent did not testify as to the specific dates when these events occurred.

When asked if he was taking the medications prescribed, respondent answered as follows:

> "I am taking it to the best of my abil-
> ity, sir; because they didn't always tell me
> what I did. He had not even mentioned I had
> a Christmas from Naked Mary Christmas Donner
> (Phonetic). And she has worked with me for
> years. I told him whenever I come to the
> hospital, I want it brought up to speed and
> her brought in."

If discharged, respondent wanted to do one of two things. Either he would go back to his business, Capitol Shoe Shine, for 28 days, or he would go to Barnes-Jewish Hospital in St. Louis for a second opinion. Respondent was born in St. Louis, and his father and brother died there.

Respondent did not know whether his nonpsychiatric medical conditions were terminal. Respondent stated it was his right to decide whether he would get a second opinion or go to

- 7 -

hospice.

Respondent testified he was no longer married because his wife divorced him when he went to Memorial. Every time respondent went to the hospital, they offered him the option of having a power of attorney. Respondent claimed the hospital insisted he have a power attorney due to his mental capacity. Respondent told them that he had no cancer in his brain. The hospital told respondent they would take him to court to make sure he had a power of attorney. Respondent did not testify whether he had in fact executed a power of attorney or had a substitute decision maker.

When asked if he believed bullets could pass through him, respondent testified about an incident when two assailants tried to shoot him. A man shot respondent point blank, and respondent had an out-of-body experience. Respondent looked down from his body and saw the bullets pass through him. Respondent also felt them go through him. The bullets hit the assailant's girlfriend in the knee. Respondent testified that if God protects you, then bullets go through you. However, he denied ever telling "that man" (presumably Dr. Black) that bullets could go through him. Respondent also denied telling anyone that he would live forever or that he was a pharaoh.

The trial court made the following finding:

"Well, the [c]ourt finds that he is

- 8 -

mentally ill and that as a result of that he
could be harmful to others.  Sounds like he
is pretty harmful to himself if he doesn't
cooperate with the treatment that he needs.
He is not assisting in taking care of his
basic needs.  I guess that would be basically
the same argument.

He will be ordered hospitalized in this
facility which is the least-restrictive al-
ternative at this time not to exceed ninety
days."

This appeal followed.

## II. ANALYSIS

Initially, we note that this case is moot.  The under-
lying judgment, entered by the trial court in July 2006, was
limited to 90 days, which has passed.  However, this case falls
within an exception to the mootness doctrine because the period
for involuntary admission is too short to permit appellate review
and the same actions will likely be taken against respondent in
the future.  In re Barbara H., 183 Ill. 2d 482, 491-92, 702
N.E.2d 555, 559-60 (1998).

Turning to the merits, respondent argues (1) the
petition was deficient because it (a) neither listed the names
and addresses of respondent's spouse, parent, guardian, substi-

tute decision maker, close relative, or friend nor described the steps petitioner took to diligently acquire that information; or (b) failed to contain the dates of the alleged occurrences; (2) no clear and convincing evidence warranted involuntary admission; and (3) hospitalization was not the least-restrictive treatment alternative.

### A. Sufficiency of the Petition

Respondent argues that the petition was deficient because Ralston failed to comply with (1) section 3-601(b)(2) of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3-601(b)(2) (West 2004)), requiring the petition contain the names and addresses of respondent's spouse, parent, guardian, substitute decision maker, close relative, or friend or describe the steps petitioner took to diligently acquire that information; or (2) section 3-601(b)(1) of the Code requiring a detailed statement of the reason for involuntary admission, including the time and place of the occurrence (405 ILCS 5/3-601(b)(1) (West 2004)). Respondent's arguments raise a question of law that we review de novo. In re Robert D., 345 Ill. App. 3d 769, 771, 803 N.E.2d 1067, 1070 (2004).

Section 3-601(b)(2) requires a petition include the following:

"The name and address of the spouse, parent, guardian, substitute decision maker,

- 10 -

if any, and close relative, or if none, the name and address of any known friend of the respondent whom the petitioner has reason to believe may know or have any of the other names and addresses. If the petitioner is unable to supply any such names and addresses, the petitioner shall state that diligent inquiry was made to learn this information and specify the steps taken." 405 ILCS 5/3-601(b)(2) (West 2004).

Strict compliance with statutory procedures is required in involuntary-commitment proceedings because such proceedings affect important liberty interests. In re Louis S., 361 Ill. App. 3d 763, 768, 838 N.E.2d 218, 222 (2005). However, reversal is not required for failure to strictly comply with the statutory procedures unless the respondent suffered prejudice. Louis S., 361 Ill. App. 3d at 768, 838 N.E.2d at 222.

Respondent cites, among other cases, this court's decision in In re Wiessing, 229 Ill. App. 3d 737, 739, 593 N.E.2d 1137, 1138 (1992), in support of his claim that reversal is required. In Wiessing, this court held that the failure to comply with section 3-601(b)(2) required reversal. Wiessing, 229 Ill. App. 3d at 739, 573 N.E.2d at 1138. A social-work consultation report prepared a month before the petition was filed

- 11 -

indicated respondent had three siblings living in the town where he was hospitalized as well as three other siblings in California, Florida, and New Mexico. Wiessing, 229 Ill. App. 3d at 739, 593 N.E.2d at 1138. Although respondent had little contact with his family, "there is no excuse for [the] failure to contact a close relative as required by the statute." Wiessing, 229 Ill. App. 3d at 739, 593 N.E.2d at 1138.

After Wiessing, the Illinois Supreme Court decided In re Nau, 153 Ill. 2d 406, 607 N.E.2d 134 (1992). Although addressing the failure to strictly comply with the requirement under section 3-611 (Ill. Rev. Stat. 1989, ch. 91 1/2, par. 3-611) regarding notice to the respondent, the supreme court held that procedural deviations from the Code do not require reversal if the defects could have and should have been objected to immediately, could have been easily cured if objected to immediately, and made no difference. Nau, 153 Ill. 2d at 419, 607 N.E.2d at 140.

Thereafter, this court, while noting that strict compliance with the statute is required, has found that reversal for failure to strictly comply with section 3-601(b)(2) of the Code is not warranted unless the respondent suffered prejudice. See In re Adams, 239 Ill. App. 3d 880, 883-85, 607 N.E.2d 681, 683-84 (1993) (finding the failure to strictly comply with section 3-601(b)(2) does not always require reversal if it could

- 12 -

be shown that no prejudice to the respondent occurred); <u>In re</u> <u>Robinson</u>, 287 Ill. App. 3d 1088, 1095, 679 N.E.2d 818, 823 (1997) (the failure to strictly comply with section 3-601(b)(2) did not require reversal because respondent failed to object to the alleged errors in the trial court, and the respondent was not prejudiced).

In the instant case, we likewise find respondent suffered no prejudice. Respondent failed to object to the alleged deficiency at the initial setting as well as the continued hearing. Moreover, although no report was attached to the petition as was the case in <u>Robinson</u>, respondent has nonetheless failed to show prejudice. In <u>Robert D.</u>, 345 Ill. App. 3d 769, 771, 803 N.E.2d 1067,1069-70 (2004), the State failed to list a substitute decision maker in the petition or state that a diligent inquiry had been made to determine if the respondent had one. Although the respondent failed to object to the deficiency at trial, the Second District refused to apply the forfeiture doctrine. <u>Robert D.</u>, 345 Ill. App. 3d at 772-73, 803 N.E.2d at 1071. Nonetheless, the court found that reversal was not required because the respondent never alleged, at trial or on appeal, that he executed a health care power of attorney or declaration for mental-health treatment or that a substitute decision maker existed. <u>Robert D.</u>, 345 Ill. App. 3d at 773, 803 N.E.2d at 1071; see also, <u>e.g.</u>, <u>In re Jill R.</u>, 336 Ill. App. 3d

956, 965, 785 N.E.2d 46, 53 (2003) (Fourth District) (finding that involuntary-administration-of-psychotropic-medication petition's failure to state whether the petitioner made a good-faith effort to determine whether the respondent had executed a health care power of attorney or a declaration for mental-health treatment was harmless because neither the record not the respondent's brief on appeal indicated such instruments existed).

Such reasoning is equally applicable here. Although respondent asserts in his brief that his "liberty interests were prejudicially violated," he identifies no potential family member who could have been listed or ascertained upon diligent inquiry. The record does contain a psychiatric social service assessment dated March 3, 2006, and attached to the treatment plan. According to that report, respondent's wife was supportive, his mother lived in Maryland, and he had family in St. Louis. However, respondent testified at the hearing that he and his wife had divorced. Nothing in the record or in the briefs on appeal indicate that this is incorrect. Further, respondent fails to identify on appeal anyone--including his mother or family members in St. Louis--that could have or should have been listed. Moreover, respondent never testified or asserted on appeal that he had executed a power of attorney.

This court has recently been flooded with appeals for alleged deficiencies to involuntary-commitment petitions.

- 14 -

Throughout the commitment process, numerous individuals review the petition, including the person who completes the petition, the facility director, the circuit clerk, the attorney for the State, the attorney for the respondent, and the trial judge. Yet not one person noticed the petition is missing required information. If discovered at trial, these alleged deficiencies could be addressed and avoid needless appeals. Compliance with the requirements of the Code would save countless resources.

Respondent also argues the petition was deficient for failing to contain the dates of the alleged occurrences. Section 3-601(b)(1) of the Code requires a petition contain:

> "A detailed statement of the reason for the assertion that the respondent is subject to involuntary admission, including the signs and symptoms of a mental illness and a description of any acts, threats, or other behavior or pattern of behavior supporting the assertion and the time and place of their occurrence." 405 ILCS 5/3-601(b)(1) (West 2004).

Here, the petition alleged respondent had threatened staff and attempted to hit a staff member at Memorial. The petition did not allege the date of the occurrences. However, the alleged deficiency was harmless. See, e.g., In re Sharon L.N., 368 Ill.

App. 3d 1177, 1186, 859 N.E.2d 627, 634 (2006) (alleged deficiencies in petition that failed to contain factual allegations was harmless where the respondent failed to object, the information was substantially contained in the medical certificates filed with the petition, a doctor testified at the hearing regarding those allegations, and respondent was familiar enough with the allegations to testify about them on her own behalf).  Specifically, the medical certificates attached to the petition described threats and an actual assault of a nurse.  At the hearing, the trial court heard allegations relating to respondent's threats and attempts to assault staff members.  Respondent testified on his own behalf regarding two specific occasions, respondent's assault of one staff member and the threat toward another.  Clearly, respondent suffered no prejudice for the failure to contain specific dates regarding the alleged incidents as he was familiar enough with the allegations to testify about them on his own behalf and did not dispute the dates.  On these facts, the alleged procedural error was harmless.

## B. Involuntary Commitment

Respondent next argues that the State failed to prove by clear and convincing evidence that (1) respondent was reasonably expected to inflict serious physical harm upon himself or another in the near future, (2) respondent was unable to provide for his basic physical needs, and (3) hospitalization was

the least-restrictive treatment alternative.

A trial court's finding that a person is subject to involuntary admission will not be reversed unless it is against the manifest weight of the evidence.  In re Jakush, 311 Ill. App. 3d 940, 944, 725 N.E.2d 785, 789 (2000).  This court gives great deference to the trial court's findings because the trial court had the opportunity to see the witnesses, hear their testimony, determine their credibility, and weigh the evidence.  In re Carmody, 274 Ill. App. 3d 46, 50, 653 N.E.2d 977, 981 (1995).

### 1. Threat of Harm

A person is subject to involuntary commitment when the evidence is clear and convincing that he suffers from a mental illness and because of that mental illness is "reasonably expected to inflict serious physical harm" on himself or another in the near future.  405 ILCS 5/1-119(1) (West 2004); In re Moore, 292 Ill. App. 3d 1069, 1071, 686 N.E.2d 641, 643 (1997).  To meet its burden, the State must submit "explicit medical testimony" that the respondent is reasonably expected to be a serious danger to herself or others as a result of her mental illness.  In re James, 191 Ill. App. 3d 352, 355, 547 N.E.2d 759, 760 (1989).  Proof of a mental illness, by itself, is not sufficient to warrant involuntary admission.  In re Grimes, 193 Ill. App. 3d 119, 124, 549 N.E.2d 616, 619 (1990).  The State need not, however, prove that the respondent is "a definite danger to

- 17 -

himself or society."  Grimes, 193 Ill. App. 3d at 124, 549 N.E.2d at 619.  "A commitment order should be affirmed where there is evidence of prior conduct along with evidence that the respondent remains in need of mental treatment."  In re Robert H., 302 Ill. App. 3d 980, 986-87, 707 N.E.2d 264, 269 (1999).  The court need not wait until respondent actually hurts himself or another before involuntarily committing him.  In re Manis, 213 Ill. App. 3d 1075, 1077, 572 N.E.2d 1213, 1214 (1991).

Respondent argues that no clear and convincing evidence established that due to his mental illness, he was reasonably expected to harm himself or another.  According to respondent, Dr. Black simply speculated about respondent's "substantially expected dangerousness toward himself and others."  Respondent argues that absent direct evidence of dangerous events from any witnesses, respondent's conduct might have been misconstrued.

To the contrary, Dr. Black testified that upon examination, respondent exhibited signs of mental illness, including delusions, pressured speech, grandiosity, increased energy, and difficulty with sleep.  Dr. Black also testified that during the hospital stay, respondent had threatened others.

In Dr. Black's opinion, respondent was reasonably expected to inflict serious physical harm upon himself or another within the immediate future.  The basis for Dr. Black's conclusion was the fact that respondent had threatened others on an

almost daily basis at the hospital to the extent of requiring restraints and medications to stabilize him. Dr. Black also testified that respondent's delusions caused him to attack other patients and threaten to kill staff.

Dr. Black's testimony also supports the conclusion that respondent was reasonably expected to inflict serious physical harm upon himself. Dr. Black testified that respondent had pulled out his IV and heart-rhythm monitor. Respondent also believed he was going to live forever. Respondent could not understand his medical risks, treatments offered, and risks if he did not get treatment for his serious nonpsychiatric medical disorders.

Dr. Black's testimony was based, in part, on his review of the medical chart. Such review was proper. An expert may rely on documents prepared by others in formulating his opinion so long as the documents are a type commonly used in the expert's profession. See In re Germich, 103 Ill. App. 3d 626, 629, 431 N.E.2d 1092, 1094-95 (1981); In re Houlihan, 231 Ill. App. 3d 677, 683, 596 N.E.2d 189, 194 (1992) (a treating psychiatrist's opinion of potential dangerousness need not be derived from firsthand observations of violence and may be based on knowledge of incidents derived from medical history records). Moreover, a witness may use unsubstantiated evidence that is ordinarily hearsay to explain the basis of his opinion, so long as that

evidence is of the type reasonably relied upon by experts in the field. In re Barnard, 247 Ill. App. 3d 234, 257, 616 N.E.2d 714, 730 (1993) (noting that an "expert may utilize otherwise inadmissible reports prepared by others in forming his opinion if the facts or data are of a type reasonably relied upon by experts in the particular field").

Consequently, the trial court's determination that respondent was reasonably expected to inflict serious physical harm upon himself or another in the near future was not against the manifest weight of the evidence.

### 2. Basic Needs

Because we have found that it was not against the manifest weight of the evidence for the trial court to conclude that respondent was reasonably expected to inflict serious physical harm upon himself or another in the near future, we need not address whether respondent was unable to provide for his basic physical needs.

### C. Least-Restrictive Treatment Alternative

Respondent last argues that the trial court's finding that hospitalization was the least-restrictive treatment alternative was against the manifest weight of the evidence. Respondent claims Dr. Black did not consider treatment other than hospitalization. Respondent points to the March 2006 psychiatric social service assessment that noted respondent was likely to return

home with his "supportive wife" and follow up with treatment at Southern Illinois University Behavioral Health.

Section 3-811 of the Code provides in relevant part as follows:

> "If any person is found subject to involuntary admission, the court shall consider alternative mental health facilities which are appropriate for and available to the respondent, including but not limited to hospitalization. The court may order the respondent to undergo a program of hospitalization in a mental[-]health facility designated by the Department, in a licensed private hospital or private mental[-]health facility if it agrees *** or the court may order the respondent to undergo a program of alternative treatment; or the court may place the respondent in the care and custody of a relative or other person willing and able to properly care for him or her. The court shall order the least[-]restrictive alternative for treatment which is appropriate."
> 405 ILCS 5/3-811 (West 2004).

The State must prove that hospitalization is the least-restric-

tive alternative.  In re Luttrell, 261 Ill. App. 3d 221, 226, 633 N.E.2d 74, 78 (1994).  To do so, it must do more than produce an expert who opines that commitment is the least-restrictive means; it must show that the expert's opinion is supported by evidence. Luttrell, 261 Ill. App. 3d at 227, 633 N.E.2d at 78.

In the instant case, no evidence suggests that a relative or other person was willing to care for respondent.  The report to which respondent refers was apparently created before respondent's divorce from his wife.  The report identifies no other family member willing to care for respondent.

Moreover, the evidence demonstrated outpatient treatment was not an option.  Dr. Black testified that respondent threatened and assaulted others to the point of requiring restraints and being confined to his room.  Dr. Black actually considered whether respondent could receive his nonpsychiatric medical treatment outside of the psychiatric wing of the hospital but concluded he could not due to his behavior.  Dr. Black also testified that if respondent left a supervised setting, he would "fairly quickly decompensate and be dangerous to himself or others quickly."  Given this evidence, the trial court's determination that hospitalization was the least-restrictive treatment alternative was not against the manifest weight of the evidence.

### III. CONCLUSION

For the reasons stated herein, we affirm the trial

- 22 -

court's order finding respondent subject to involuntary admission.

Affirmed.

McCULLOUGH and COOK, JJ., concur.