2017 IL App (4th) 160604
NOS. 4-16-0604, 4-16-0605 cons.

FILED
August 24, 2017
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* CAROL B., a Person Found Subject to Involuntary Admission | ) ) ) | Appeal from Circuit Court of Sangamon County |
| (The People of the State of Illinois, Petitioner-Appellee, v. (No. 4-16-0604) Carol B., Respondent-Appellant). | ) ) ) ) ) ) | No. 16MH363 |
| -------------------------------------------------------------------- | ) | No. 16MH366 |
| *In re* CAROL B., a Person Found Subject to Involuntary Medication and Electroconvulsive Therapy | ) ) ) ) | |
| (The People of the State of Illinois, Petitioner-Appellee, v. (No. 4-16-0605) Carol B., Respondent-Appellant). | ) ) ) ) ) ) | Honorable Jennifer M. Ascher, Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion. Justices Harris and Appleton concurred in the judgment and opinion.

**OPINION**

¶ 1        The procedures under the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1-100 to 6-107 (West 2016)) attempt to balance a patient's liberty interest with society's interest in both protecting the public from harm and caring for those who cannot care for themselves. *In re Luttrell*, 261 Ill. App. 3d 221, 231, 633 N.E.2d 74, 81-82 (1994). In

this case, we are called upon to balance those interests where the State administered psychotropic medication and electroconvulsive therapy without the consent of respondent, Carol B.

¶ 2       In July 2016, after a hearing on the State's petitions for involuntary admission and the administration of involuntary treatment, the trial court found the State violated section 2-107(a) of the Code (405 ILCS 5/2-107(a) (West 2016)) by administering psychotropic medication to respondent without her consent when there was no threat of serious and imminent physical harm. However, the court found the violation to be harmless and subsequently granted both orders for a period not to exceed 90 days.

¶ 3       Respondent appeals, asserting (1) the State's violation of section 2-107 of the Code resulted in a deprivation of her rights that requires reversal and (2) her psychiatrist failed to provide her with written documentation of the risks, benefits, side effects, and alternatives of treatment—as required by section 2-107.1 of the Code (405 ILCS 5/2-107.1 (West 2016))—until four days after he began administering medication, which requires reversal of the court's order for involuntary treatment. For the following reasons, we reverse.

¶ 4                                I. BACKGROUND

¶ 5       On June 18, 2016, respondent was admitted to Memorial Medical Center (Memorial) for psychiatric treatment, after spending an unknown number of days at BroMenn Medical Center (BroMenn). Two days later, on June 20, 2016, Memorial filed a petition for involuntary admission. On June 23, 2016, Memorial filed a petition for the involuntary administration of medication. A hearing date for both petitions was scheduled for July 1, 2016. However, by agreement of the parties, the State withdrew the initial petitions with the understanding that the defect would be remedied and new petitions would be filed soon thereafter. The State filed a new petition for involuntary admission on July 13, 2016, which was

25 days after respondent's initial admission to Memorial (Sangamon County case No. 16-MH-363). On the same date, the State filed a petition for the administration of involuntary treatment (Sangamon County case No. 16-MH-366). These two petitions form the basis for this appeal.

¶ 6                                    A. The Petitions

¶ 7                          1. *The Petition for Involuntary Admission*

¶ 8            The petition for involuntary admission alleged respondent (1) had a mental illness and was reasonably expected, without inpatient treatment, to engage in conduct placing herself or another person in physical harm or in reasonable expectation of being physically harmed; (2) had a mental illness but refused treatment, failed to understand the need for treatment, and would suffer emotional or mental deterioration if not treated on an inpatient basis; and (3) required immediate hospitalization to prevent harm to herself or others. The attached certificates from medical personnel indicated respondent was experiencing delusions that (1) her body parts were missing, (2) her hometown did not exist, (3) her husband was not real, (4) hospital staff intended to poison her, and (5) her throat was closed. She neglected her hygiene, sometimes refused to eat, and occasionally descended into a catatonic state.

¶ 9            2. *The Petition for the Administration of Involuntary Treatment*

¶ 10            The petition for the administration of involuntary treatment requested authorization to administer both psychotropic medication and 12 sessions of electroconvulsive therapy to treat respondent's mental illness. The petition stated respondent was not functional and was at risk for malnutrition or death if not treated with the electroconvulsive therapy. It also asserted respondent could not make a consistent or rational choice after considering the risks and benefits of treatment.

¶ 11                                    B. Scheduling the Hearing

¶ 12            The trial court scheduled both petitions for a hearing on July 15, 2016, at which time the case was rescheduled for a hearing on July 22, 2016, because of the minimum three-day notice requirement. See 405 ILCS 5/2-107.1(a-5)(1) (West 2016) (requiring a minimum of three days' notice prior to a hearing). Initially, the State requested a continuance until July 29, 2017, but it later withdrew the request.

¶ 13            During the July 15, 2016, court appearance, respondent's counsel pointed out the lengthy period of time respondent had been hospitalized while awaiting a hearing and emphasized the importance of moving forward with the hearing as soon as possible due to the State's administration of psychotropic medication and electroconvulsive therapy without respondent's consent. Respondent's counsel further argued the administration of the medication and electroconvulsive therapy violated section 2-107 of the Code because no emergency situation necessitated the administration of medication prior to the hearing, as medical records showed respondent was eating regularly with prompting. Respondent's counsel asserted, as a result of the delayed proceedings, Memorial would be nearly finished with respondent's electroconvulsive-therapy treatments before she received a hearing, which circumvented the provisions of the Code and respondent's rights. Respondent's counsel explained she would ask for a temporary restraining order to prevent the further administration of medication, but suddenly halting the medication would place respondent's health at risk.

¶ 14            At the end of the hearing, the trial court took under advisement the question of whether Memorial violated the Code by administering medication to respondent without her consent in violation of section 2-107 of the Code.

¶ 15        C. The Involuntary-Admission Hearing

¶ 16   On July 22, 2016, which was 34 days after her admission, respondent's hearing on the petition for involuntary admission commenced.

¶ 17   Respondent refused to attend the hearing, and her counsel asked that respondent be excused so as to avoid any emotional harm. Dr. Sankrant Reddy, a psychiatrist, testified he had been treating respondent nearly every day since her June 18, 2016, admission. He diagnosed respondent with "bipolar disorder, most recent episode depressed, severe with psychotic and catatonic features." He further diagnosed her with insomnia and a cognitive disorder not otherwise specified, but possibly dementia or Alzheimer's disease. Dr. Reddy could not properly diagnose respondent's cognitive disorder until he treated her depression.

¶ 18   Respondent was transferred from BroMenn to Memorial for the purpose of obtaining electroconvulsive therapy. Nothing in the record provides information regarding respondent's admission to BroMenn. Dr. Reddy testified, on the date of her arrival, respondent was delusional and sometimes displayed catatonic symptoms. Unlike the comatose appearance often portrayed on television, Dr. Reddy described respondent's catatonic phases to include staring, engaging in repetitive behaviors, exhibiting bizarre behaviors, displaying waxing flexibility (body parts and extremities fail to move unless manipulated), and refusing to eat or cooperate with treatment plans. One of the biggest concerns was respondent's inconsistent eating, as she would sometimes eat nothing and sometimes would eat everything on her tray. She required prompting from staff to eat.

¶ 19   Due to her symptoms, Dr. Reddy opined that respondent lacked the capacity to consent to treatment. She also had no guardian or power of attorney to make decisions on her behalf. Because respondent lacked the capacity to consent to treatment, Dr. Reddy determined

she also lacked the capacity *to refuse* treatment. Therefore, starting June 18, 2016, Dr. Reddy authorized the administration of psychotropic medication—including Wellbutrin, Remeron, and Ativan—without respondent's consent. At the time, Dr. Reddy admitted respondent's condition would not cause serious and imminent physical harm to herself or others.

¶ 20 On July 1, 2016, Dr. Reddy found respondent posed a risk of serious and imminent physical harm to herself by her failure to eat and engage in basic hygiene. He therefore ordered the administration of electroconvulsive therapy on an emergency basis. The treatment began on July 5, 2016, and she engaged in treatment three times per week. By the date of the hearing, she had completed 8 of 12 rounds of electroconvulsive therapy, some of which were administered despite her resistance.

¶ 21 In justifying the emergency administration of electroconvulsive therapy, Dr. Reddy explained a person could die of malnutrition in a matter of weeks or months. Although respondent sometimes ate her meals, her eating was inconsistent. From the date of her admission at Memorial, respondent lost 5 pounds—from 160 pounds down to 155 pounds. At a height of 5 feet 4 inches, her ideal weight was 120 pounds. Dr. Reddy testified her condition was not so serious as to warrant placing a feeding tube. In fact, she would eat when prompted.

¶ 22 In the week preceding the hearing, Dr. Reddy observed respondent's bipolar disorder to be so severe that she had developed depressive symptoms like hopelessness and passive thoughts of death, such as hoping to die. Despite these thoughts of death, she never expressed any desire or intention to kill herself. Dr. Reddy deemed she was not a risk for suicide and therefore did not require any one-on-one monitoring. Respondent spent the majority of time in her bed, but there were occasions when she would run up and down the halls. Dr. Reddy confirmed respondent could walk, but she refused to walk in his presence.

¶ 23     Dr. Reddy opined, if released, respondent could not provide for her basic needs; she required someone else—at least a family member—to feed and bathe her. Respondent had been suffering from major depression for approximately one-third to one-half of her 61 years, and she was far from her baseline, where she could cook and care for herself. Dr. Reddy suspected her decline was due to dementia.

¶ 24     Dr. Reddy also opined that respondent was unable to understand the need for treatment. He believed she would suffer mental or emotional deterioration if not treated on an inpatient basis. Dr. Reddy noted, historically, respondent only improved after receiving electroconvulsive therapy, and she needed maintenance electroconvulsive therapy to prevent deterioration. Dr. Reddy testified that the failure to treat respondent could lead to her condition worsening and to suicide attempts.

¶ 25     According to Dr. Reddy, respondent was incapable of living on her own because she could not care for herself or make rational decisions. He also ruled out the possibility of placing her in a nursing home immediately because her condition was unstable and she needed electroconvulsive therapy. After treatment for depression, Dr. Reddy believed a nursing home could be an appropriate option. Accordingly, Dr. Reddy opined that hospitalization was the least restrictive alternative for placement, and he requested she be involuntary admitted to Memorial for a period not to exceed 90 days.

¶ 26     After considering the evidence, the trial court granted the State's petition. The court found respondent was unable to meet her basic needs, and her passive thoughts of dying placed her in a possible position to harm herself. Although respondent required prompting or help with eating or bathing, which made her appropriate for a nursing home, her depression and passive thoughts of death made her an unsuitable candidate. The court determined hospitalization

was the least restrictive alternative. The court therefore ordered respondent involuntarily committed to Memorial for a period not to exceed 90 days.

¶ 27            D. Hearing on the Administration of Involuntary Treatment

¶ 28            Immediately following the hearing on the petition for involuntary admission, the trial court held a hearing on the petition to administer involuntary treatment. Respondent's counsel again asked for respondent to be excused from the hearing, as respondent said it would upset her to attend and cause emotional harm.

¶ 29            The State asked the trial court to authorize Memorial to administer (1) Wellbutrin and Remeron to treat respondent's depression, (2) Ativan to treat catatonia, (3) Zyprexa to treat psychosis, and (4) electroconvulsive therapy. Dr. Reddy was already administering these medications to respondent, though he had stopped administering Ativan two days prior to the hearing.

¶ 30            Dr. Reddy recommended respondent continue on the 300 milligrams of Wellbutrin he had been giving her for her depression. He suggested she also continue on her dosage of 30 milligrams of Remeron to treat her depression. Dr. Reddy recommended respondent take 0.5 to 6 milligrams of Ativan to control her catatonia. He also suggested respondent continue on 10 milligrams of Zyprexa to treat her psychotic symptoms. Additionally, Dr. Reddy wanted the option of treating respondent with 150 to 1200 milligrams of Lithium for her bipolar disorder if it became necessary.

¶ 31            Dr. Reddy explained the side effects for each medication, and he testified that respondent did not understand the side effects of the medications when he explained them to her. He noted the antidepressants prescribed to respondent—Wellbutrin and Remeron—both had side effects of increasing suicidal thoughts. Zyprexa could also cause death in patients with dementia.

According to Dr. Reddy, he provided respondent with written documentation of the side effects of every recommended medication approximately four days after beginning treatment, but she refused to accept it. According to Dr. Reddy, respondent received a list of alternative treatments from a staff member.

¶ 32 In addition to medications, Dr. Reddy also requested authority to provide electroconvulsive therapy. The electroconvulsive therapy would treat respondent's catatonia. Electroconvulsive therapy involves placing a patient under general anesthesia and sending electric currents into the brain through two electrodes attached to the scalp. The currents would trigger a seizure, which would treat a patient's depression, catatonia, and mania. Patients faced the risk of cardiac arrest and broken bones, but respondent was deemed a low risk for these side effects by a physician. Additionally, the therapy could result in memory loss. In the past, respondent complained of a headache and a burning sensation around the intravenous injection site.

¶ 33 Dr. Reddy testified he had already administered eight electroconvulsive-therapy treatments to respondent on an emergency basis, after he concluded she posed a serious and imminent risk of physical harm to herself. He explained he could only administer electroconvulsive therapy to respondent if it was on an emergency basis, as she lacked the capacity to consent and no one had guardianship or power of attorney over her interests. Dr. Reddy testified respondent required treatment on an emergency basis. Although she was not in serious and imminent risk of physical harm within a few days of her admission, Dr. Reddy stated, "we didn't want her to get to the point where she would stop eating." At the time, on average, respondent was skipping one meal per day. Dr. Reddy found skipping a meal could

deprive a patient of needed nutrition, but he further noted she was meeting her nutritional requirements in the meals she did eat.

¶ 34       Respondent began her first electroconvulsive therapy treatment on July 5, 2016. Dr. Reddy initially intended to wait until respondent's court appearance, but after reviewing the law, he concluded he could authorize the treatment himself if she was at risk for serious and imminent physical harm. Dr. Reddy acknowledged respondent resisted the electroconvulsive therapy because she did not think it helped her. Since beginning the therapy, she had shown some improvement, though not a lot.

¶ 35       Dr. Reddy recommended respondent receive 12 or more electroconvulsive-therapy treatments—8 of which had already been completed—with treatment provided three times per week. Dr. Reddy admitted the electroconvulsive therapy was administered even when respondent refused, stating she lacked the capacity to refuse.

¶ 36       In Dr. Reddy's professional opinion, the benefits of the electroconvulsive therapy outweighed any risks, particularly where less restrictive procedures—group therapy and other medications—had failed to treat respondent in the past. Without electroconvulsive therapy, Dr. Reddy opined, respondent's prognosis was poor.

¶ 37       Although respondent acknowledged her mental illness, Dr. Reddy explained she had no understanding of or insight into her illness. She did not understand how her mental illness affected her or the seriousness of her illness. Further, Dr. Reddy testified respondent could not reason about her treatment options: "So when she said, I don't want [electroconvulsive therapy], then I ask her, well, how else—how do you think I can help you? What other treatments can help? And she's not able to communicate that."

¶ 38 Since being admitted, respondent's functionality had not improved, though her ability to communicate and alertness had improved. She would not eat or bathe without prompting or assistance. She also began expressing passive thoughts of death. Dr. Reddy observed respondent to be anxious, distressed, and sometimes fearful. She reported her husband was going to leave her for another woman. When asked, "Do you believe that [respondent] is suffering physically because of her mental illness?" Dr. Reddy responded, "no." He then clarified, stating respondent's catatonia made her less active and her failure to properly eat affected her health.

¶ 39 Dr. Reddy testified that, at her baseline, respondent could get out of bed, cook a simple meal, shower, and have a conversation. While in the hospital, she would remain in bed all day without eating or bathing if permitted to do so. She was able to eat on her own, but only once food was provided to her. Sometimes she would eat none of her meal; sometimes she would eat all of it. Dr. Reddy stated respondent was eating more regularly since beginning the electroconvulsive therapy.

¶ 40 Following the presentation of evidence, the trial court made the following findings. The court first found the State violated section 2-107(a) of the Code by administering medication to respondent even though it was not necessary to prevent respondent from causing serious and imminent physical harm to her herself or others. Under section 2-107.1 of the Code, the court found clear and convincing evidence that respondent suffered from a serious mental illness, that she was provided with written information regarding her treatment options, and that the benefits of the requested treatment options outweighed the risks. Because respondent was unable to consent or understand her treatment options and electroconvulsive therapy had been

successful while other methods of treatment had not, the court granted the petition for the administration of involuntary treatment for a period not to exceed 90 days.

¶ 41 This appeal followed. Respondent's appeal of the trial court's order for involuntary admission was docketed as No. 4-16-0604, and her appeal of the court's order for the administration of involuntary treatment was docketed as No. 4-16-0605. We have consolidated these cases for review.

¶ 42                                    II. ANALYSIS

¶ 43 On appeal, respondent asserts (1) the State's violation of section 2-107 of the Code resulted in a deprivation of her rights that requires reversal and (2) Dr. Reddy failed to provide her with written documentation of the benefits, side effects, and alternatives of treatment until four days after he began administering medication, which requires reversal. Before we reach the merits, we must address the issue of mootness.

¶ 44                                    A. Mootness

¶ 45 Respondent's 90-day commitment order expired by its own terms in October 2016. Thus, respondent's case is moot. See *In re Barbara H.*, 183 Ill. 2d 482, 490, 702 N.E.2d 555, 559 (1998) (a case is moot when the original judgment no longer has any force or effect). Generally, Illinois courts do not decide moot questions or render advisory opinions. *In re Alfred H.H.*, 233 Ill. 2d 345, 351, 910 N.E.2d 74, 78 (2009). However, we will consider an otherwise moot case where it falls under a recognized exception. These exceptions include (1) the public-interest exception, (2) the collateral-consequences exception, and (3) the capable-of-repetition-yet-evading-review exception. See *id.* We consider these exceptions on a case-by-case basis. *Id.* at 354, 910 N.E.2d at 79.

¶ 46    The narrowly construed public-interest exception to the mootness doctrine allows a reviewing court to consider an otherwise moot case when (1) the question presented is of a public nature, (2) a need exists for an authoritative determination for the future guidance of public officers, and (3) the question is likely to recur in the future. *Id.* at 355, 910 N.E.2d at 80. Respondent must demonstrate "a clear showing of each criterion." *In re Andrew B.*, 237 Ill. 2d 340, 347, 930 N.E.2d 934, 938 (2010).

¶ 47    Respondent's appeal centers on the State's involuntary administration of medication in violation of section 2-107 of the Code (405 ILCS 5/2-107 (West 2016)) and the consequences that can arise from such a violation. This question is of a public nature and likely to recur in the future, as the State's application and interpretation of the Code affects any patient involuntarily admitted. Thus, there exists a need for an authoritative determination to guide mental health professionals and the State when those professionals decide to administer involuntary treatment prior to the trial court entering an order authorizing the treatment.

¶ 48    The State concedes we should reach the merits of the petition authorizing the administration of involuntary treatment (No. 4-16-0605), as the issues on appeal concern the administration of medication. We accept the State's concession. At the same time, the State argues the involuntary-admission case (No. 4-16-0604) is moot, as the administration of medication is wholly separate from the involuntary-admission proceedings. We disagree.

¶ 49    Respondent does not challenge the sufficiency of the evidence with respect to the order for involuntary admission. Rather, respondent argues the State's administration of involuntary treatment prior to the involuntary-admission proceedings affected her due-process rights by altering her mood and behavior prior to her opportunity to be heard. We conclude that,

under these circumstances, the public-interest exception to the mootness doctrine applies to both Nos. 4-16-0604 and 4-16-0605. We now turn to the merits of respondent's argument.

¶ 50                    B. Whether Memorial Violated the Code

¶ 51        Involuntary-admission proceedings implicate an individual's liberty interest. *In re Torski C.*, 395 Ill. App. 3d 1010, 1017, 918 N.E.2d 1218, 1225 (2009). "The Code's procedural safeguards are not mere technicalities but essential tools to safeguard these liberty interests." *In re John R.*, 339 Ill. App. 3d 778, 785, 792 N.E.2d 350, 356 (2003).

¶ 52        When a respondent challenges the trial court's order for involuntary admission, the allegations in the petition must be proved by clear and convincing evidence. 405 ILCS 5/3-808 (West 2016). We will not overturn the trial court's finding as to the sufficiency of the evidence unless it is against the manifest weight of the evidence. *In re Todd K.*, 371 Ill. App. 3d 539, 542, 867 N.E.2d 1104, 1107 (2007). In this case, respondent does not challenge the sufficiency of the evidence with respect to her involuntary admission. Respondent's concern centers on the actions of the State prior to the trial court's hearing on the pending petition for involuntary admission. Specifically, respondent asserts Dr. Reddy administered medication in violation of her rights under section 2-107 of the Code. "In determining the requirements of a statute and whether a respondent's statutory rights have been violated, our review is *de novo*." *In re Amanda H.*, 2017 IL App (3d) 150164, ¶ 34.

¶ 53        Under section 2-107(a) of the Code, a patient or, if the patient lacks capacity, someone with decision-making power, has the right to refuse treatment. 405 ILCS 5/2-107(a) (West 2016). "If such services are refused, they shall not be given unless such services are necessary to prevent the recipient from causing serious and imminent physical harm to the recipient or others and no less restrictive alternative is available." *Id.* To prove a patient threatens

- 14 -

serious and imminent physical harm, the State must show "the individual poses an *immediate* threat of physical harm to himself or others." (Emphasis in original.) *In re Orr*, 176 Ill. App. 3d 498, 512, 531 N.E.2d 64, 73 (1988).

¶ 54        Here, upon her admission, Dr. Reddy determined respondent lacked the capacity to consent to treatment and lacked a guardian or power of attorney to make a decision on her behalf. Thus, under section 2-107(a), respondent had the right to refuse the administration of medication. Absent a situation where respondent posed a threat to cause serious and imminent physical harm to herself or others, Dr. Reddy lacked a legal basis to administer the medication. Nothing in the record, however, suggests Dr. Reddy provided respondent an opportunity to refuse treatment. By Dr. Reddy's own admission, he began administering psychotropic medication—including Remeron, Wellbutrin, and Ativan—to respondent on the date of her admission, despite his belief that she was not at risk for serious and imminent physical harm at that time. He did this under the belief that respondent's lack of capacity rendered her "unable to refuse" treatment.

¶ 55        Dr. Reddy's opinion that he could administer treatment to respondent because she was incapable of refusing is a gross misinterpretation of section 2-107(a) of the Code. Under Dr. Reddy's logic, when a patient lacks capacity, regardless of whether that patient's condition may cause serious and imminent physical harm, he may choose whatever treatment he deems appropriate prior to any court hearings because the patient can neither consent to nor refuse his decision. Here, because respondent lacked the capacity to consent to treatment and her condition did not require administration of medication to prevent her from causing serious and imminent physical harm to herself or others, the trial court properly found the State violated section 2-107(a).

¶ 56                                    C. The Remedy

¶ 57         The Code sets forth no specific remedies for a violation of section 2-107(a). The

State argues, even if Dr. Reddy violated section 2-107(a), such a violation constituted harmless

error as to respondent's involuntary admission where respondent is unable to demonstrate

prejudice. A finding of harmless error is appropriate "if the defects could have and should have

been objected to immediately, could have been easily cured if objected to immediately, and made

no difference." *In re Tommy B.*, 372 Ill. App. 3d 677, 684, 867 N.E.2d 1212, 1219 (2007).

¶ 58         Respondent argues such a violation of her rights requires reversal of the order for

involuntary admission. In support, she compares this case to others in which the appellate court

reversed the trial court's involuntary admission order. See, *e.g.*, *In re Louis S.*, 361 Ill. App. 3d

774, 780, 838 N.E.2d 226, 232 (2005) (reversing the trial court's order granting a petition to

administer involuntary treatment where the hospital failed to provide the patient with written

notification of the risks, benefits, side effects, and alternative treatments); *In re David M.*, 2013

IL App (4th) 121004, ¶ 35, 994 N.E.2d 694 (reversing the trial court's order for the

administration of involuntary treatment where the State failed to provide adequate notice of the

hearing and where the hearing was combined with the petition for involuntary admission).

Additionally, in *Amanda H.*, 2017 IL App (3d) 150164, ¶¶ 36, 45, 47, the appellate court

reversed the trial court's involuntary-admission order where the petition failed to disclose the

identities of police officers who transported the respondent to the hospital and the State thereafter

failed to file a dispositional report for the court's consideration in determining the treatment

goals and least restrictive means of providing that treatment.

¶ 59         We agree with respondent. The egregious, cumulative errors in this case are not

harmless and, instead, violated respondent's due-process rights. First, Dr. Reddy administered

psychotropic medication when respondent's condition did not require the administration of medication to prevent respondent from causing serious and imminent physical harm to herself or others. Following the harmless-error analysis under *Tommy B.*, we note respondent was not in a position to make a timely objection to the involuntary administration of treatment because, at the time Dr. Reddy authorized the medication, the court proceedings and appointment of counsel would not commence for more than three weeks. Moreover, in Dr. Reddy's own words, respondent's lack of capacity rendered her incapable of refusing any medication he chose to administer. Given these circumstances, the violation of section 2-107(a) could not be easily cured. As respondent's counsel noted in her initial court appearance, respondent had been on mood- and behavior-altering medication for more than three weeks by the first court appearance, and such medication could not be suddenly stopped without placing respondent's health at risk.

¶ 60　　　The State asserts the violation of section 2-107(a) made no difference in the end, as the trial court granted the petitions for involuntary admission and administration of treatment. We are not willing to accept the argument that "the ends justify the means" in this situation. By placing respondent on psychotropic medications when she did not pose a risk to cause serious and imminent physical harm to herself or others, the trial court lost the ability to determine respondent's mental capacity for itself. In this situation, we have evidence the medication altered respondent's mood and behavior. For example, although she self-reported as "happy" at the time of her admission, by the hearing date, respondent's mental state had declined to the point that she hoped to die. Thus, we cannot say the premature administration of medication "made no difference."

¶ 61　　　Second, the State's delay in filing its amended petition left respondent involuntarily admitted for more than a month before she received a hearing date. During this

time, not only did Dr. Reddy subject respondent to psychotropic medications, but in the face of no evidence that medication was necessary to prevent respondent from causing serious and imminent physical harm, he also caused respondent to undergo eight rounds of electroconvulsive therapy—which requires anesthesia and triggers seizures—on the basis that she was a serious and imminent threat to herself, as she was not eating properly or bathing regularly.

¶ 62     Section 2-107 of the Code allows for involuntary treatment prior to the involuntary-admission hearing when there is a risk of serious and imminent physical harm. 405 ILCS 5/2-107(a) (West 2016). However, the legislature could not have contemplated a patient would wait over a month—June 18, 2016, to July 22, 2016—for a hearing, all the while being administered medication involuntarily. In fact, had the State received the continuance it initially requested, respondent's 12-part electroconvulsive-therapy regimen could have been completed before she even had an opportunity to be heard. Where a respondent lacks the capacity to consent, she relies on the Code to protect her rights. A delay of over a month nearly permitted Memorial to circumvent the Code by treating and releasing respondent before she had the opportunity for a hearing. Such a delay is inexcusable and shows a complete disregard for respondent's liberty interests.

¶ 63     Dr. Reddy concluded that respondent needed electroconvulsive therapy on an "emergent basis" due to her "inability to provide basic life-sustaining needs." Under section 2-107(a), this is not the standard. Rather, Dr. Reddy should have considered whether her disinterest in eating posed the risk of serious and imminent physical harm.

¶ 64     Third, Dr. Reddy admitted he did not initially provide respondent with written information regarding the risks, benefits, side effects, and alternative treatments prior to starting a psychotropic-treatment regimen on June 18, 2016. Rather, he waited approximately four days

to provide her with such information. The State argues the delay was *de minimis*, as she received the necessary written documentation prior to her hearing. We disagree. Because Dr. Reddy found respondent lacked the capacity to consent or refuse, he unilaterally concluded such written information was unnecessary prior to beginning the treatment regimen because she lacked the ability to appreciate the information. What Dr. Reddy failed to gather is that "[t]he rights provided in the statute were not placed in the Code to ensure that a respondent understands a medication's side effects but to ensure a respondent's due process rights are met and protected." *John R.*, 339 Ill. App. 3d at 784, 792 N.E.2d at 355.

¶ 65 The trial court is charged with determining whether a respondent possesses the capacity to make a reasoned decision about her treatment. "A necessary predicate to making this informed decision is that the respondent must be informed about the medications' risks and benefits." *In re Cathy M.*, 326 Ill. App. 3d 335, 341, 760 N.E.2d 579, 585 (2001). The same logic applies prior to the hearing. A respondent cannot make a reasoned decision about treatment if she is not provided the requisite information in writing prior to the hospital administering the treatment. Respondent was deprived of her opportunity to refuse the medication, and because she was already on medication for a significant period of time prior to the long-delayed hearing, the trial court had no way of determining whether respondent lacked the capacity to consent at the time of her admission.

¶ 66 Whether the side effects of the medication were worth the risk was an issue for the trial court, yet Dr. Reddy took it upon himself to decide that the possible side effects—which included death for dementia patients, heart attack, and suicidal behavior—were worth the risk. That the court ultimately agreed with Dr. Reddy is beside the point. Respondent was entitled to her day in court before the long-term administration of mind- and behavior-altering medication.

¶ 67        We decline to find the error harmless, and accordingly, we reverse the trial court's

involuntary-admission order. Further, because we have reversed the trial court's involuntary-

admission order, respondent no longer qualifies as a "[r]ecipient of services" for the

administration of involuntary treatment under section 1-123 of the Code (405 ILCS 5/1-123

(West 2016)). See *In re John N.*, 364 Ill. App. 3d 996, 998, 848 N.E.2d 577, 578-79 (2006). We

therefore also reverse the court's involuntary-medication order.

¶ 68                                III. CONCLUSION

¶ 69        Based on the foregoing, we reverse the trial court's orders for involuntary

admission and the administration of involuntary treatment.

¶ 70        Reversed.